Gray, Bedell & Hughes plaintiffs in error, *vs.* John H. Bass, defendant in error.

1. A count on an implied contract, may be joined with one on a special contract, and that too by amendment.
2. The verdict of the jury being supported by evidence will not be disturbed, inasmuch as the matter of whether the factor had made such special contract, was a question of fact for the jury to decide, upon the whole evidence submitted to them.

Gray, Bedell & Hughes *vs*. Bass.

3. The question of ratification was one which was based on the intention of the parties, and was a matter of evidence properly submitted to the jury.

4. The amount of damage in this case depended on the view the jury took from the evidence of the contract itself; and the finding of the jury in this case being sustained by the evidence as to the amount of damage, taking the value at the time they held the owner would have had his cotton sold, and allowing expenses, etc., will not be set aside—being supported by the evidence.

Pleading.    Factors.    New Trial.    Before Judge JOHNSON.    Muscogee Superior Court.    May Term, 1870.

So much of this case as does not appear in the motion for new trial, as set forth, is as follows: Bass averred that Gray, Bedell & Hughes, Factors and Commission Merchants, at Columbus, Georgia, on the 4th day of January, 1868, received from him one hundred and ten bales of cotton, weighing fifty-seven thousand four hundred and seventy-three pounds, worth $12,000 00, drew a draft against it for certain advances, at sixty days after date, and, in consideration of their commissions, etc., agreed to ship the same to Liverpool for Bass, and that it should not be sold before the maturity of said draft; and yet, by failing to advise their agents of the contract, they allowed it to be sold, *in transitu*, and before said draft matured, damaging Bass $5,000 00.  In another count, by amendment, he averred that the cotton weighed sixty thousand five hundred pounds and that the contract was, that it was to be sent to Liverpool and not sold till sixty days after its shipment from the port of Savannah, and yet they fraudulently sold it on the 27th of January, 1868, to arrive in Liverpool, on the basis of six and seven-eighths pence per pound; whereas, had it been sold as late as, by the contract, it should have been, it would have brough fifteen pence per pound.    This was demurred to, because of an improper joinder of counts, but the demurrer was overruled.

The defendants pleaded that in April, 1868, Bass accepted a bill of exchange on Blissey, Brown & Company of Liverpool, for £505 6s. 7d., in full satisfaction of said promises and un-

dertakings, and further as appears in the motion for new trial. On the trial, Bass testified that defendants had his said cotton, weighing fifty-nine thousand seven hundred and fourteen pounds, being good middlings, and he wished $40 00 per bale advanced upon it if he shipped it to Liverpool. Defendants wished to ship it to Liverpool and said they would arrange for such advance at sixty days, without interest during the sixty days, and with the Liverpool rate after sixty days. They said Bass could hold it as long as he pleased after the maturity of the draft. Bass expressed suspicion of Liverpool houses, to which they replied there was no danger, that they would ship to Brown, Chipley & Company, or Strother & Company. Bass told them to ship his to either of said houses. Next day, before the cotton was put out of the warehouse, Bass told Gray, with whom he had been treating as aforesaid, that he would fix a day in the Spring, after the maturity of said draft, on which the cotton should be sold, without regard to its value, because he feared to give any discretion as to the time of selling said cotton. He said if no such positive instructions were given and cotton advanced, his would be reported as sold at the lowest price, and insisted on sending such instructions with the cotton. Gray said such a course was not commercial, that Liverpool could be reached by mail in ten or twelve days and by telegram at once, and direction could be given as wished. On the 28th of January, 1868, Gray advised him that his cotton had been sold to arrive, and Bass at once urged them to telegraph recinding the sale or that they substitute other cotton for his. No one ever offered to make such substitution. (The Court held that evidence of offer to replace the cotton was admissible only so far as it tended to show Bass' acquiescence in said sale.) He never consented to, or ratified said sale. Defendants would not sign such a receipt as Bass wished, because they would not impliedly acknowledge themselves liable to him for loss, nor would he pay upon their receipted bill lest he should release them, Bass then proposed to pay upon their receipting for so much

money paid, leaving the matter of liability open.   All that Bass ever received on account of said cotton was $5,000 00.

Upon cross-examination, he said, when he received the account of sales, and the draft of £505 7s. 6d., he made no objections to the sales, but had always expressed his dissatisfaction.   About a week after, he paid them $1,500 00 balance due as per their account, because he had been trusted by them with the draft and because he was advised to pay it and make his claim against them.   Bass never paid the revenue tax or any expense on said cotton, he received $4,391 25, and the bill of exchange in March, 1869, of which the net value in currency was over $3,317 92.   The receipt was read in evidence as follows: " Columbus, 6th April, 1868, received of John H. Bass, fifteen hundred and thirty 59-100 dollars on account, Gray, Bedell & Hughes."   Plaintiff read in evidence a letter of defendant's dated 28th (18th) January, 1868, stating "We are advised to-day of the sale of your cotton to arrive, at 7¼d. in Liverpool."   A witness testified that the cotton was worth in Liverpool as follows: On the 8th of February 1869, 8⅝d., equal to $14,306 46; on the 28th of February, 1869, 9⅜d., equal to $15,550 50; on the 1st of May, 1869, 12⅜d., equal to $20,941 35.   Another witness put the prices as follows for middlings in Liverpool: 10th January, 1869, 7⅛d.; 13th February, 8⅜d.; 28th February, 9⅜d.; 13th March, 10¼d.; 27th March, 10¼d.; 17th April, 12⅛d.; 1st May, 12⅝d.; 15th May, 12d.; 29th May, 11¼d.; 12th June, 11d.; and said that ordinary cotton was worth about 1d. less, at said respective dates, than middlings.

Plaintiff read the interrogatories of one Starr, who said his firm received said cotton at Savannah, on the 27th of December, 1867, said to be Bass', and for shipment to Liverpool; that on the 2d of January, 1868, it was shipped from Savannah, consigned to Blissey, Brown & Company, Liverpool. On the 28th of December, 1867, Wilder & Fullarton, business friends of Starr & Roberts, drew a draft against this cotton for a sum equal to $5,616 85 on said consignees, and pay-

able in sixty days. No special instructions as to the disposition of said cotton were given; it was to be fully advanced upon and take the usual course. On the 16th of December, 1867, Starr & Roberts received a telegram, saying they had one hundred and eighteen bales of cotton, and wished $5,000 00 advanced upon it. Starr & Roberts negotiated with Wilder & Fullarton for the $5,000 00, and sent it the next day; the money was raised on the draft last mentioned, though the draft was not drawn till the cotton arrived. About the 18th of January, 1868, the cotton was sold at 7¼d. for middling, valued at 6⅞d. when it arrived. Starr & Roberts, on 18th January, 1868, advised defendants, and on 20th January, 1868, they replied that Bass was dissatisfied, because the sale was made to arrive. On 27th January, 1868, Starr & Roberts offered to have the cotton replaced and hold it, and he thought he wrote thus to Bass as well as to defendants; no response was made to this; the cotton could then have been replaced at the same or a little higher figure; it was, at the date of sale at Liverpool, worth 7⅞d. It arrived in Liverpool between the 10th and 14th of February, 1868, and was then and there worth 8½d.

For the defense, Gray testified that no instructions as to the sale of the cotton were given by Bass, but that several days after he had made the advance, which they procured from Starr & Roberts, Bass asked when it would be sold, and Gray replied that it would arrive about the maturity of the draft, and would be sold on arrival to meet the draft, as was usual. Nothing more was said until Bass complained at such sale. Defendants were as much surprised by such sale as Bass, and wrote Starr & Roberts to replace the cotton; they offered to do so, saying they could at a less price than the said selling price, but Bass declined; he saw all the correspondence as it occurred. Cotton declined steadily for several weeks, and Bass made no demand on defendants nor expressed further dissatisfaction till it began going up. In about four or six weeks defendants received

Gray, Bedell & Hughes *vs.* Bass.

from said consignees an account of sale, with a letter to them from Bass. By defendants' books Bass was then in their debt $1,530 00, and the balance due on consignee's account of sales was £505 6s. 7d., and defendants drew a draft for that amount and handed it to Bass; he then made not the slightest objection to said sale. About a week after, he came to pay the $1,530 00 and wished a receipt, admitting that the cotton transaction was open; defendants refused to sign such receipt, and gave the one in evidence. He said that defendants got nothing but storage and usual commissions for forwarding; all other expenses were paid by parties who handled it after it left defendants. (These are stated, but parts of them are illegible.) Hughes testified that in the latter part of January, 1868, he was passing as Bass & Gray were talking of this sale, and heard Bass say, " No, let the d—d thing go," and that he heard no more complaint till the $1,530 00 was paid.

Bass, recalled, said Starr & Roberts did propose to him to buy other cotton, and offering to advance on it, but said he replied that he had had enough of them.

The jury found for plaintiff for $3,831 76, with interest from the 1st of April, 1870. Defendants moved for a new trial upon the following grounds:

1st. Because the Court overruled the demurrer of defendants to plaintiff's declaration on the ground of misjoinder of counts, and on general demurrer, the first being a case for negligence, and the second being in assumpsit for breach of contract.

2d. Because the Court, against the objection of defendants, caused the second plea of defendants, on motion of plaintiff, to be stricken.

3d. Because the Court refused to admit in evidence in reduction of damages, proof to show that defendants offered to replace with cotton of the same grade and quantity the cotton sold, belonging to plaintiff, and only allowed said evi-

dence to be used so far as it might bear to show acquiescence in the sale.

4th. Because, after abandonment by plaintiff in the course of the trial of the first count in his declaration, the Court refused to charge the following request submitted in writing by defendants' counsel: "That the first count having been abandoned by plaintiff, if they find that Gray, Bedell & Hughes were acting as agents of Bass, they are not liable on the second count."

5th. And because the Court refused to charge, except as modified, that, in order to recover, it is incumbent on plaintiff to show the net amount the cotton would have realized had it been sold according to instructions. This the Court refused, and gave: "You may take the price at which the cotton actually sold, and the price at which it should have been sold, and allow reasonable expenses, and the difference would be the measure of damages."

6th. Because the Court refused to charge: "It is necessary that plaintiff should prove that he did direct the sale of the cotton at some particular time," but charged that, on the contrary: "I charge you that, if Bass was informed that his cotton was sold without his instructions, the law did not require him to do a useless thing by directing that sold which had already been sold, but you may look to the evidence and say whether there has been any custom proved to draw bills at sixty days on cotton shipped, and to sell the cotton to meet the bill at maturity; and, if you believe from the evidence, that there was such a custom proved, you may then, in the absence of other proof, infer that Bass would have instructed it to be sold at the time it was customary to sell it, and the damages would then be the difference between the price actually obtained for the cotton and the price it would have been sold at if Bass had directed it to be sold at the maturity of the bill. You may also look to the evidence and see for what purposes the cotton was shipped to Liverpool; whether or not the evidence shows it was the intention

and object of the plaintiff, communicated to the defendants in shipping the cotton to Liverpool, to hold it until spring; and, if you believe the evidence so shows, you may then determine at what time in the spring Bass would have directed it sold, and the measure of damages would be the difference between the price of the cotton at the time it was sold and the price it would have brought in the spring at such time, as you may determine from the evidence, Bass would have directed it sold."

7th. Because the Court refused to charge: "If the jury believe from the evidence that Bass received the draft of £505 6s. 7d. on the 1st April, 1868, being the balance account sales rendered, from Liverpool, and exhibited to him, and that he did not notify Gray, Bedell & Hughes that he still dissented from said sale, this would be considered in law a ratification of the sale;" but charged: "It would amount to a ratification if the parties intended it as a settlement, otherwise it would not." ·

8th. Because the Court refused to charge that: "A receipt from Gray, Bedell & Hughes to J. H. Bass for $1,530 00, on account, is evidence to show that Bass owed Gray, Bedell & Hughes that much money, but is no evidence to show that Gray, Bedell & Hughes owed Bass anything," which charge the Court refused to give, as asked, but said: "Ordinarily, it would prove that, but in this case the jury may take the receipt in connection with other evidence in the case, and say what it proves."

9th. Because the Court refused to charge: "If you believe from the evidence that plaintiff, on being informed of the facts, dissented, and afterwards said, 'damn it, let it go,' that is in law a ratification;" and said on the contrary: "I tell the jury it is a question for them to determine with what intent the remark was made."

10th. Because the Court refused to charge: "That a consignee advancing and being under acceptance, has a discretion to sell the product advanced upon, even before the bill matures. (Refused as abstract.)

11th. Because the Court did charge as follows: " The plaintiff alleges that the defendants undertook and assumed to ship for plaintiff to Liverpool, one hundred and ten bales of cotton, and to hold the same, in Liverpool, until the maturity of a sixty day bill drawn against it, and not to sell until directed to do so by plaintiff. This is a question of fact to be determined by you from the evidence. You will look at all the evidence in the case, and say whether or not the defendants so undertook and assumed; and if you shall come to the conclusion that the defendants did not so undertake and assume, then I charge you this amounted to an agreement on their part to ship the cotton to Liverpool and to hold it there until such time as the plaintiff should direct it to be sold. Plaintiff also alleges that the defendants permitted their factors in Liverpool to sell the cotton before he directed it to be sold. If you believe the evidence shows this, then I charge you the defendants have violated their agreement; that is to say, if you believe they made the agreement before stated, they are responsible to the plaintiff for the damages resulting from such violation."

" In determining the measure of damages, I give you this as the rule. It is insisted by defendants' counsel that it was necessary that plaintiff should have ordered the cotton sold at some particular time, to fix the amount of damages, but I charge you that if plaintiff was informed that his cotton had been sold without his instructions, the law did not compel him to do a useless thing, by directing that sold which had already been sold; but you may look to the evidence and say whether or not there has been any custom proved to draw bills at sixty days on cotton shipped and to sell the cotton to meet the bill at maturity, and if you believe that the evidence shows there was such a custom, you may then infer, in the absence of other proof, that plaintiff would have instructed it to be sold at the time it was customary to sell it; and the measure of damages would be then the difference between the price actually obtained for it, and the price for

which it would have been sold, if plaintiff had directed it to be sold at the maturity of the bill.  You may also look to the evidence, and see for what purpose the cotton was shipped to Liverpool; whether or not the evidence showed it was the intention of plaintiff, communicated to the defendants, in shipping the cotton to Liverpool, to hold it until spring; and if you believe the evidence so shows, you may then determine at what time in the spring plaintiff would have ordered it sold, and the measure of damages would be the difference between the price of the cotton at the time it was actually sold and the price it would have brought at such time in the spring as you may determine from the evidence that plaintiff would have directed it to be sold.  This is the plaintiff's side of the case."

"The defendants rely on two propositions: First, they say they never made any such contract.  Well, you will look at the evidence and say whether they made such a contract as is set forth.  Of course if you find they never made such contract, they are not liable for a violation of it.  This fact you will determine from the evidence.

"They next say, that if they made such a contract, after it was violated, and the plaintiff was fully informed of the fact of the sale, he ratified it—first, by not expressly dissenting from it.  Now, on this point, I charge you that if the sale took place contrary to the agreement, and plaintiff was informed of all the facts and circumstances of the sale, and did not dissent from it, then this, in law, would be a ratification, but you will say from the evidence whether or not he did dissent.

"Defendants next say that plaintiff ratified the sale by accepting a bill of exchange drawn by defendants on Blissey, Brown & Company, for balance proceeds of sale cotton, as per account sales exhibited to him.  On this point I charge you that the non-acceptance of a bill of exchange for the balance of sale does not amount to a ratification, nor is a ratification, unless it was intended by the parties as a settle-

ment when it was accepted. If it was so intended by both parties, then it was a ratification; if it was not so intended by the parties, then the acceptance of the bill of exchange was not a ratification of the sale."

12th. Because in the argument of the case by plaintiff's counsel, B. A. Thornton, who opened the case, and was arguing on the first count to show negligence, was stopped by the Court inquiring: "On what count do you rely?" And counsel replied, "On the contract," after which the counsel for plaintiff no longer argued that question of negligence, nor did defendant's counsel touch upon it, except to caution the jury not to confound it with the second count, and yet, when the counsel for defendant asked the Court to charge the jury: "That the first count had been abandoned, and that if Gray, Bedell & Hughes, acting as agents of Bass, they were not liable on the second count," the Court refused so to charge.

13th. Because the verdict of the jury is excessive.

14th. Because it is manifestly against the weight of evidence.

15th. Because it is contrary to evidence and the principles of justice and equity.

16th. Because it is decidedly and strongly against the weight of evidence.

LOCHRANE, C. J.

1. The question raised on the declaration in this case we do not regard as error. The suit originally proceeded on the principle of implied contract, and the amendment charges a *special contract*. Such a joinder is clearly within our law of amendments, and we will not dwell on this point.

The facts of the case may be substantially stated as follows: John H. Bass had a lot of cotton in Columbus which he shipped through the plaintiff in error to Liverpool. He alleges and proves that he desired instructions given not to sell

Gray, Bedell & Hughes *vs.* Bass.

his cotton until some time in the spring, after the expiration of sixty days, upon which he was to have an advance of forty dollars per bale. The cotton was shipped to Starr & Roberts at Savannah, and through them, by Wilder & Fullarton, to Blissey, Brown & Company, Liverpool, with instructions by Gray Bedell & Hughes. A draft on it was negotiated by these parties, and the cotton sold by the consignees to arrive, before it probably left the port of Savannah. As soon as this fact was ascertained, it appears that Bass had notice, and Gray, Bedell & Hughes were themselves surprised at the indecent haste. Some letters were written which brought about an alleged offer to *replace* the cotton, but the mode by Bass evidence was, that he could replace and they would hold, etc. which he declined. It was also in evidence that the cotton went to Starr & Roberts, without any instructions, to be fully advanced on, and to take the customary course of cotton to Europe. Mr. Gray's testimony shows that the cotton was shipped for Bass; that they showed him the correspondence as received; that they told him his bill of sixty days would hold the cotton for that time, and if he desired to hold longer he could do so. Afterwards, Bass received balance due on account of sales and paid them an account due them. All these facts were in evidence, and out of them arose various requests to charge, which were refused, and other charges given and excepted to.

2. We have carefully considered the facts and the law in this case; the doctrine of principal and agent and ratification, and have examined the Judge's charge in the light of the facts as they were presented to the jury, and have come to the conclusion that there was no error in the charge of the Court, or in the finding of the jury. It makes no difference in what capacity Gray, Bedell & Hughes agreed to ship Bass' cotton, whether as principal or as agent, if the contract was to hold it until spring for Bass, the liability is the same. When the jury have evidence of a fact and find thereon, we will not control their finding, except it is strongly and deci-

dedly against the weight of the evidence. In this case the testimony of Bass was before the jury on the fact of the contract, and it was for them to find, and their finding that Bass contracted with them to have his cotton shipped and held, is sustained by proof.

3. Again, if the jury believed Bass, and they had a right to believe him, he never ratified the sale by any act of his, and the jury were properly charged by the Judge, that the intention to do so was for them to decide.

4. Again, if the jury had evidence of the value of the cotton in the spring running up, from sale to sixty days after bill, and if they believed that it was not the intention of Bass to sell up to a certain time, and they took the price at that time, less expenses, it was a fair and equitable view of the case.

Again, Bass knew nothing of these drafts on Blissey, Brown & Company. They were drawn by parties who were unknown to Bass. Bass had not drawn, nor had he knowledge, nor did he know who got the cotton in Savannah as consignees of Gray, Bedell & Hughes. All this which brought about the sale of his cotton was bad faith, in view of the instructions and manifest intention of Bass not to sell. They traded his cotton as their own, drawing on it and selling it at their own whim and pleasure; and Gray, Bedell & Hughes, while not themselves doing the act, are the men who violated the instructions and put it into the hands of others to commit it. In this view of the case, then, we say that, under the facts of this case, we cannot set aside the verdict, nor order a new trial for the errors assigned.

Judgment affirmed.